# IN THE SUPREME COURT OF CALIFORNIA

JAMES GUND et al.,
Plaintiffs and Appellants,

v.

COUNTY OF TRINITY et al.,
Defendants and Respondents.

S249792

Third Appellate District
C076828

Trinity County Superior Court
11CV080

---

August 27, 2020

Justice Cuéllar authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, and Kruger concurred.

Justice Groban filed a dissenting opinion, in which Justice Chin concurred.

---

GUND v. COUNTY OF TRINITY

S249792


Opinion of the Court by Cuéllar, J.


We entrust to police officers the enormous responsibility of ensuring public safety with integrity and appropriate restraint, a mission they sometimes pursue by requesting help from the very public they're sworn to protect. When members of the public engage in "active law enforcement service" at a peace officer's request, California law treats those members of the public as employees eligible for workers' compensation benefits. (Lab. Code, § 3366, subd. (a).)[1] While this allows such individuals to receive compensation for their injuries without regard to fault, it comes with a catch: Workers' compensation then becomes an individual's exclusive remedy for those injuries under state law. (§ 3602, subd. (a); *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 16 (*Shoemaker*).) That can make a difference for some members of the public who answer a peace officer's call to help with "active law enforcement," because workers' compensation benefits are narrower in scope than the menu of damages available in tort claims. Whether compensation for a member of the public injured in the course of responding to a request for assistance from law enforcement is limited to workers' compensation, or whether civil damages are available, depends on the question at the heart of this case: What does it

---

[1] All statutory references are to the Labor Code unless otherwise noted.

mean for an individual to engage in "active law enforcement service"?

Norma and James Gund received a call from Trinity County Sheriff's Corporal Ronald Whitman, who asked them to assist law enforcement by checking on a neighbor who had called 911 requesting help. When the Gunds did so, they walked into an active murder scene and suffered a violent attack. What we must resolve is whether Mr. and Mrs. Gund engaged in active law enforcement service and are limited to workers' compensation benefits for their injuries based on Corporal Whitman's request for assistance, which they allege misrepresented the potential danger.

We conclude the Gunds were indeed engaged in "active law enforcement service." When the Gunds provided the requested assistance, they delivered an active response to the 911 call of a local resident pleading for help. A response of this kind unquestionably falls within the scope of a police officer's law enforcement duties. Whether or not any alleged omissions in Corporal Whitman's request could conceivably prove relevant to legal actions alleging malfeasance, they do not change our conclusion about the scope of workers' compensation in this tragic case. We affirm the judgment of the Court of Appeal.

## I.

On the afternoon of March 13, 2011, the California Highway Patrol (CHP) received a phone call from Kristine, a female caller.[2] Kristine whispered, "Help me," and said she

---

[2] Because we are reviewing a motion for summary judgment, "we view the evidence in the light most favorable to

lived at end of the Kettenpom airstrip. Kettenpom is situated in the southwest corner of Trinity County, a mountainous expanse of 3,200 square miles. (Trinity County, *About Trinity County* <https://www.trinitycounty.org/About> [as of Aug. 24, 2020].)[3] The County is inhabited by fewer than 15,000 people. (U.S. Census Bureau, *Population of Trinity County, California: Census 2010 and 2000 Interactive Map, Demographics, Statistics, Graphs, Quick Facts* <https://www.census.gov/quickfacts/trinitycountycalifornia> [as of Aug. 24, 2020].) The CHP dispatcher relayed the content of Kristine's call to the Trinity County Sheriff's Department. The Sheriff's Department is in Weaverville, almost 100 miles away from Kettenpom. (Trinity County, California, *Sheriff Department* <https://www.trinitycounty.org/Sheriff-Department> [as of Aug. 24, 2020].) The CHP dispatcher explained she was hesitant to call Kristine back in case she was trying to avoid being overheard. Twice, a Trinity County dispatcher nonetheless attempted to contact Kristine, but the calls went straight to voicemail. The county dispatcher relayed this information to Trinity County Sheriff's Corporal Ronald Whitman.

Corporal Whitman knew the Gunds lived in the vicinity of the Kettenpom airstrip. En route to Kristine's home but still some distance away, he called Norma Gund and explained that

---

plaintiffs as the losing parties, resolving evidentiary doubts and ambiguities in their favor." *Elk v. Hills Power, LLC v. Bd. of Equalization* (2013) 57 Cal.4th 593, 606.)

[3] All Internet citations in this opinion are archived by year, docket number and case name at <http://www.courts.ca.gov/38324.htm>.

her neighbor, Kristine, had called 911. He asked Mrs. Gund if she would go check on Kristine, as they were much closer to Kristine's home and he was still hours away. After Mrs. Gund agreed, Corporal Whitman asked if Mr. Gund was home, and Mrs. Gund said no. He instructed Mrs. Gund not to go to Kristine's home by herself. Mrs. Gund asked what Kristine said on the call, and Corporal Whitman responded that she said, "Help me." Mrs. Gund then inquired: "Are you sure? Is that all she said?" Corporal Whitman responded, "She said two words, 'Help me.'" Mrs. Gund told Corporal Whitman that Mr. Gund had just arrived home, and Corporal Whitman said, "Good." Corporal Whitman did not tell Mrs. Gund that Kristine had whispered on the phone, that the CHP dispatcher believed she had been trying to call secretly, or that the county dispatcher's return calls to Kristine went straight to voicemail.

Mrs. Gund confirmed for Corporal Whitman that she'd been to Kristine's property before, to help the previous owner with snow and fallen trees. Corporal Whitman mentioned the impending arrival of a major storm, which "must be what this is all about." "It's probably no big deal," he continued. Corporal Whitman then asked if Mrs. Gund had ever met Kristine's boyfriend and if he seemed violent. Mrs. Gund confirmed that she had met Kristine's boyfriend. In response to whether he ever seemed violent, Mrs. Gund indicated she "didn't know. He seemed real mellow." Corporal Whitman gave Mrs. Gund his cell phone number and instructed her to call him as soon as she and her husband had checked on Kristine. Believing the emergency to be weather related, the Gunds drove to Kristine's home. They speculated that maybe a tree had fallen or that

4

Kristine, a young city girl, was having trouble with her wood burning stove.

After arriving at Kristine's home, Mrs. Gund went in first, while Mr. Gund stayed in the truck. Immediately after entering Kristine's home, Mrs. Gund was attacked by the man who had just murdered Kristine and her boyfriend. Mr. Gund, hearing some of the commotion, entered the home and saw the man holding down his wife and cutting her throat with a knife. The man then attacked Mr. Gund, as well — tasing him, punching him, and cutting his throat. During the attack, Mr. Gund saw on the floor a motionless body with a bag over the head. Mrs. Gund escaped to the truck and drove to a nearby store for help. Mr. Gund managed to disarm the attacker and flee on foot to his home. He got another vehicle and reunited with Mrs. Gund at the store.

The Gunds filed this action against Trinity County (the County) and Corporal Whitman. The First Amended Complaint alleges causes of action for: liability for the act or omission of a public employee; vicarious liability for the act or omission of a public employee; misrepresentation by a public employee, with actual malice; and vicarious liability for misrepresentation by a public employee, with actual malice. The Gunds contend Corporal Whitman sought to secure their assistance by falsely assuring them that Kristine's call was probably weather related and knowingly withholding the following facts: Kristine whispered, the CHP dispatcher thought Kristine was calling secretly, and the county dispatcher's return calls went straight to voicemail.

The County and Corporal Whitman moved for summary judgment. Workers' compensation, they argued, was the Gunds'

5

exclusive remedy because they sustained their injuries while engaged in active law enforcement service under section 3366.[4] The Gunds argued that section 3366 did not apply because, given Corporal Whitman's alleged misrepresentations, they did not understand themselves to be engaged in "active law enforcement service" when they complied with his request, nor would a reasonable person have understood this to qualify under that standard.

The trial court granted the summary judgment motion. Despite the Gunds' contention that they relied on Corporal Whitman's alleged misrepresentations, the trial court found that section 3366 applied because a response to a 911 call under the circumstances in this case amounts to assisting a peace officer in active law enforcement. The Gunds appealed. Although the Court of Appeal agreed that the Gunds provided active law enforcement service at Corporal Whitman's request, it noted the trial court's failure to acknowledge factual contentions that Corporal Whitman misled them about the nature of the requested activity. The Court of Appeal ultimately found the misrepresentations did not change the outcome in the trial court. The appellate court reasoned that because Corporal Whitman's direct response to Kristine's 911 call would have been considered active law enforcement, so too should the

---

[4] The County and Corporal Whitman alternatively argued that the Gunds' suit was barred for the following reasons: (1) the Gunds were employees because they assisted upon command under section 3366; (2) County Resolution No. 163-87 deems volunteers to be employees if they provide "service" to the county; and (3) they have governmental immunity from tort liability. The Court of Appeal did not reach these arguments; neither do we.

Gunds' response on his behalf. The Court of Appeal concluded that responding to a 911 call for unspecified help — which the Gunds did here — "is clearly active law enforcement" and section 3366 applies, rendering workers' compensation benefits the Gunds' exclusive remedy. (*Gund v. County of Trinity* (2018) 24 Cal.App.5th 185, 195 (*Gund*).)

We ordered review on the court's own motion to decide the scope of workers' compensation coverage available to the plaintiffs in this situation, as the availability of such coverage would constrain them in seeking other redress for their injuries. Specifically, we address whether plaintiffs engaged in active law enforcement under section 3366 after a peace officer asked them to check on a neighbor who dialed 911 for help and the officer allegedly misrepresented the situation.

## II.

Workers' compensation spreads the cost of injuries associated with the risks of employment even as it also limits the extent of recovery a covered worker could have gained through ordinary civil litigation. (§ 3600, subd. (a); *Shoemaker, supra,* 52 Cal.3d at p. 16.) In a typical workers' compensation claim, benefits are available for an employee's injury "arising out of and in the course of the employment" where "the injury is proximately caused by the employment." (§ 3600, subds. (a), (a)(3).) But volunteers are typically not eligible for these benefits. (See § 3352, subd. (a)(9) [volunteers are not employees].) Civilians like the Gunds who volunteer to assist law enforcement only become "employee[s]" — whose exclusive remedy lies in the workers' compensation scheme — if they fall within the scope of section 3366's coverage. (§ 3366, subd. (a);

7

see § 3602, subd. (a) [workers' compensation is "the sole and exclusive remedy of the employee"].)

Section 3366, subdivision (a) provides the following: "For the purposes of this division, each person engaged in the performance of active law enforcement service as part of the posse comitatus or power of the county, and each person . . . engaged in assisting any peace officer in active law enforcement service at the request of such peace officer, is deemed to be an employee of the public entity that he or she is serving or assisting in the enforcement of the law, and is entitled to receive compensation from the public entity in accordance with the provisions of this division."

To determine whether a civilian is an "employee," we approximate the typical workers' compensation inquiry in the atypical context defined by the terms of this statute. First, we consider whether a peace officer asked for assistance with a task that qualifies as active law enforcement service. Second, we ask whether the civilian was injured while engaged in that requested service. This two-step framework incorporates the typical workers' compensation requirement that an injury arise out of and in the course of the employment because the volunteer is only an "employee" if they are engaged in active law enforcement service at the request of the police. Put differently, a peace officer's request informs whether a civilian's injury arose out of and in the course of qualifying employment.

No one in this case disputes that the Gunds assisted "at the request of" a peace officer, nor is there any dispute that they were "engaged in assisting" that officer when they sustained their injuries. (§ 3366, subd. (a).) But to apply this framework here we must decide if Corporal Whitman's requested assistance

was for a task of "active law enforcement service." (*Ibid.*) We begin by considering the statute's language and structure, bearing in mind that "our primary goal is to determine and give effect to the underlying purpose of the law." (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332; *People v. Valencia* (2017) 3 Cal.5th 347, 357 [" 'the words of the statute must be construed in context, keeping in mind the statutory purpose' "].) We start by considering the ordinary meaning of the statutory language, the language of related provisions, and the structure of the statutory scheme. (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1246; see also *Larkin v. Workers' Compensation Appeals Bd.* (2015) 62 Cal.4th 152, 157–158.) If the language of a statutory provision remains unclear after we consider its terms, structure, and related statutory provisions, we may take account of extrinsic sources — such as legislative history — to assist us in discerning the relevant legislative purpose. (*Winn v. Pioneer Medical Group, Inc.* (2016) 63 Cal.4th 148, 156; see also *Holland v. Assessment Appeals Bd. No. 1* (2014) 58 Cal.4th 482, 490.)

Based on what we glean from the language, structure, and legislative history of section 3366 — as well as related statutory provisions that round out the relevant context — we conclude that Corporal Whitman requested "active law enforcement service" when he asked the Gunds to respond to Kristine's 911 call for help, and that "active law enforcement service" is what the Gunds provided.

## A.

"[A]ctive law enforcement service" is not a phrase defined by section 3366, nor is it parsed by any other related statutory provision. The Gunds contend it reaches only a narrow subset

of policing tasks: the type of active investigation and suppression of crime entailing risk of death or serious injury while providing protection to the public. But defendants assert "active law enforcement service" simply identifies the main duties of a police officer. These words arguably support either the Gunds or the defendants, because one could reasonably understand "law enforcement" to either describe a specialized portion of police activity or to encompass most of what police do. A literal reading of "law enforcement service" conveys the idea of service to enforce the law, and perhaps especially — given how the term "law enforcement" is less commonly associated with civil regulatory law — efforts to investigate violations of or otherwise enforce criminal or traffic laws. (See, e.g., *Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 298 [" 'Law enforcement officers carry upon their shoulders the cloak of authority to enforce the laws of the state' "].) This reading treats as separate from "law enforcement" the broader range of public welfare and routine order maintenance functions police officers may perform, irrespective of how tenuously such activities connect to enforcing criminal or traffic law. (See Decker, *Emergency Circumstances, Police Responses, and Fourth Amendment Restrictions* (1999) 89 J.Crim. L. & Criminology 433, 445–446, fn. omitted ["police serve to ensure the safety and welfare of the citizenry at large," which "may involve approaching a seemingly stranded motorist or lost child to inquire whether he or she needs assistance, assisting persons involved in a natural disaster, or warning members of a community about a hazardous materials leak in the area"]; *Michigan v. Bryant*

(2011) 562 U.S. 344, 368 ["Police officers in our society function as both first responders and criminal investigators"].)

Yet judicial opinions and the public discourse routinely embrace a more capacious understanding of "law enforcement," treating police officers as all but synonymous with "law enforcement officers." (See, e.g., *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 215, 216 [using both "law enforcement officers" and "police officers" in discussing the reasons for imposing vicarious liability on a public entity when such an officer commits a sexual assault while on duty].) From this vantage point, "active law enforcement service" plausibly refers to the full range of work law enforcement officers do — stretching far beyond the investigation of crime, the suppression of criminal offenses, and the detention of criminals. It is this subtle but meaningful distinction in what "law enforcement" means that we must address at the outset.

We have good reasons to embrace, in this context, a more capacious understanding of what "law enforcement service" means. For reasons detailed below, we conclude that the term "active law enforcement service" — as used in section 3366 — falls short of encompassing every conceivable function a peace officer can perform. But neither is it quite so narrow that we are compelled to hold it only applies to the arrest and detention of criminals, or the direct suppression of crime. We conclude that "active law enforcement service" includes a peace officer's duties directly concerned with functions such as enforcing laws, investigating and preventing crime, and protecting the public. Whatever the outer limits of the term, "active law enforcement" certainly includes the arrest and detention of criminals, as well as — given the range of reasons

that ordinarily trigger emergency calls to police — responses to emergency calls for unspecified assistance, such as Kristine's 911 call for help. (See, e.g., Livingston, *Police Discretion and the Quality of Life in Public Places: Courts, Communities, and the New Policing* (1997) 97 Colum. L.Rev. 551, 559 [investigation, arrest, and prosecution of those committing serious crimes is "straightforward" police intervention]; see also *id.* at p. 567 [the modern " 'crime-fighting' " strategy of policing includes rapid response to 911 calls for service].)

Consider at the outset the structure of section 3366. It applies when an individual is injured while engaged in active law enforcement service, either on command or voluntarily at the request of a peace officer. Government Code section 26604 indicates that sheriffs "shall command the aid" of inhabitants as they think necessary to execute their duties. This authority for calling forth citizens to aid in law enforcement is the *posse comitatus* power. (Kopel, *The Posse Comitatus and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement* (2015) 104 J.Crim. L. & Criminology 761, 769–806.) The *posse comitatus* power predates the nation's founding and has a complicated history. (*Id.* at pp. 792–793.) At the federal level, the Fugitive Slave Act of 1850 contained *posse comitatus* provisions enabling federal law enforcement officers to compel northerners to assist in the capture of enslaved people who had escaped bondage. (*Id.* at pp. 798–800.) After the Civil War, the power was used in reverse to enforce civil rights legislation in the Reconstruction south. (*Id.* at pp. 800–801.) But the more familiar use of the *posse comitatus* power was the western frontier version: where a sheriff summoned the posse to pursue an escaped outlaw or confront a violent gang. (*Id.* at

p. 802.) During this era, preservation of the peace did not fall exclusively to peace officers. (Pressel, The Western Peace Officer (1972) pp. 30–31.) On the frontier, preserving the peace was public duty. (*Ibid.*) Amicus curiae Rural County Representatives of California explains that unlike with the large, organized police forces for urban centers, peace officers in remote areas — like Trinity County — still rely on community members to assist in ensuring community safety.

Until January 1, 2020, it was a misdemeanor for civilians to refuse many of these commands for assistance. Penal Code former section 150 established what assistance a peace officer could command by criminalizing the failure to join the *posse comitatus*, or power of the county. A peace officer could command, with threat of criminal sanction, assistance in making an arrest, recapturing an escapee, preventing a breach of the peace, or preventing the commission of any other criminal offense. (Pen. Code, former § 150.) These services are ones for which an individual inherently exposes herself to risks in order to protect the public. (See *Gund*, *supra*, 24 Cal.App.5th at p. 198.) So although section 3366's implicit reference to Penal Code former section 150 limits the type of services a peace officer can command upon penalty of misdemeanor to services that appear crime-facing, that reference does not necessarily limit what assistance qualifies as active law enforcement service. Sheriffs may still "command the aid of as many inhabitants of the sheriff's county as he or she thinks necessary in the execution of his or her duties." (Gov. Code, § 26604.) These provisions suggest that the range of active law enforcement services an officer can request, or command without the

13

possibility of misdemeanor charges, may prove somewhat broader than assistance with crime-fighting activity alone.

Section 3366, subdivision (a) contains additional language bearing on our construction of "active law enforcement service." It deems individuals providing this "active law enforcement service" as employees of the public entity they are serving "*in the enforcement of the law.*" (*Ibid.*, italics added.)  This variation on law enforcement service is consistent with the idea that the statute covers a range of activity somewhat more limited than all police work, and it reinforces the notion that coverage extends only to those individuals undertaking certain explicit action "in the enforcement of the law." (*Ibid.*)  Taken together, section 3366 and Penal Code former section 150 are most reasonably understood to suggest that the concept of active law enforcement service, whatever its scope, may stop short of covering all the general work of a police officer — including, for instance, clerical work bearing a more remote relationship to "the enforcement of the law" — but its purview is more capacious than simply criminal investigation and prevention of specific crimes.

The statute's language, structure, and legislative history also suggest a more capacious understanding of "active law enforcement service" to encompass protection of civilians from the kinds of physical threats to their well-being that could plausibly expose volunteers to material risk of injury.  The statute provides compensation to individuals who sustain injuries while assisting peace officers with such active law enforcement service.  (§ 3366, subd. (a).)  Read in the context of how workers' compensation laws usually operate, section 3366 is best understood as an exception to an exclusion from coverage.

(See § 3352, subd. (a)(9) [volunteers are not employees]; § 3366 [individuals engaging in active law enforcement service at the request of a peace officer are employees].)  Such exceptions to exclusions are to be read broadly, consistent with the directive to construe workers' compensation provisions with the purpose of extending coverage.  (See *Minish v. Hanuman Fellowship* (2013) 214 Cal.App.4th 437, 466, fn. 16 [citing *Machado v. Hulsman* (1981) 119 Cal.App.3d 453, 455–456]; § 3202 [workers' compensation provisions shall be liberally construed with the purpose of extending benefits].)

Moreover, providing coverage through a workers' compensation model means that, although the extent of compensation may be limited, civilians can get that compensation without fighting over the specifics of an officer's request for help or whether the request amounted to a negligent misrepresentation.  (§ 3600, subd. (a)(3).)  Through this system, determinations of coverage turn on whether an individual's injuries arose out of and in the course of the employment, rather than on the subjective awareness of particular individuals.  (§ 3600, subd. (a).)  This model makes it much simpler and quicker for injured civilians to get compensation.  It's also amenable to consistent application — as individuals engaged in the same service will not face disparate coverage determinations based on subjective factors, like their understanding of potential risk.  An overly narrow interpretation of active law enforcement service, or one that turns on subjective factors, would leave without recourse many individuals injured while obliging a peace officer's request for assistance, undermining its civilian-protective purpose.

This broader, civilian-protective interpretation also fits with the statute's history. The Law Revision Commission proposed the bill enacting section 3366 in direct response to this court's 1961 decision in *Muskopf v. Corning Hospital District* (1961) 55 Cal.2d 211 (*Muskopf*). In *Muskopf*, we abolished the "vestigial remains" of common law sovereign immunity due to its significant erosion over time. (*Id.* at p. 221.) In response, the Legislature temporarily suspended *Muskopf's* effect (Stats. 1961, ch. 1404, pp. 3209–3210) and directed the Law Revision Commission to complete a study of the issue (see Assem. Conc. Res. No. 22, Stats. 1957 (1956–1957 Reg. Sess.) res. ch. 202, p. 4590). The Law Revision Commission considered a report by Professor Arlo Van Alstyne about injuries sustained when citizens aid police in law enforcement. (See A Study Relating to Sovereign Immunity (Jan. 1963) 5 Cal. Law Revision Com. Rep. (1963) pp. 404, 452–453.) Van Alstyne suggested that "the elimination of possible misgivings as to financial consequences in the event injury is sustained might conceivably tend to promote more willing and wholehearted cooperation by citizens when called upon to give aid in law enforcement." (*Id.* at p. 453.) Van Alstyne proposed alternative possibilities to compensate citizens injured while providing that requested assistance: absolute tort liability or limited workers' compensation benefits. (*Id.* at pp. 453–454.)

The Law Revision Commission chose to propose the workers' compensation benefits model, noting it was "better policy to extend to such persons the same benefits and protections that are provided to peace officers generally." (Recommendation Relating to Sovereign Immunity, Number 6 — Workmen's Compensation Benefits for Persons Assisting

Law Enforcement or Fire Control Officers (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) p. 1505, fn. 4 (Recommendation Relating to Sovereign Immunity); see *id.*, at pp. 1505–1506.) The Law Revision Commission's ultimate recommendation suggested expanding coverage from only those commanded into service to include those assisting upon request because "[m]any people would assume that they are required to assist police officers whenever requested to do so, and others would feel it their civic duty whether required to by law or not." (Cal. Law Revision Com., Second Supp. to Mem. 23 (May 18, 1962) study 52(L), at p. 1.) The Law Revision Commission's recommendation elaborated that "[w]hen a person not trained in law enforcement . . . is required by law to assume the risk of death or serious injury to provide such protection to the public, or when he undertakes to do so at the request of a peace officer . . . , he and his dependents should be provided with protection against the financial consequences of his death or injury." (Recommendation Relating to Sovereign Immunity, *supra*, 4 Cal. Law Revision Com. Rep., at p. 1505.)

The bill's author, Senator James A. Cobey, also served on the Law Revision Commission — and he appears to have shared this concern. In his floor statement, Senator Cobey echoed the Law Revision's Commissions recommendation that when someone without law enforcement training "is required by law to assume the risk of death or serious injury to provide such protection to the public, or when he undertakes to do so at the request of a peace officer . . . , he and his dependents should be provided with some protection against the financial consequences of his death or injury." (Floor statement by Senator James A. Cobey regarding Sen. Bill No. 47 (1963 Reg.

Sess.) (Cobey Floor Statement).) He also included this same language in his letter to Governor Edmund Brown. (James A. Cobey, Senate Bill Author, letter to Governor Edmund G. Brown, June 21, 1963 (June 1963 Cobey Letter).)

A complementary concern familiar from the history and underlying logic of workers' compensation was also at play in the legislative drafting process: limiting expansive liability for public agencies. Senator Cobey repeatedly explained that the exclusive remedy provision of the workers' compensation scheme "will prevent such persons from bringing civil actions for damages and will eliminate the possibility of public entities having to pay catastrophic judgments." (Cobey Floor Statement, *supra*; and June 1963 Cobey Letter, *supra*.) The legislative analysis for the bill also notes that using the workers' compensation system responds to a lack of uniformity of law and practice in an area that "contains large potential liability." (Legis. Analyst, analysis of Sen. Bill No. 47 (1963 Reg. Sess.) as amended May 3, 1963, p. 1.) That limiting the extent of public agency liability was a guiding concern for the Legislature is no surprise, as section 3366 was enacted as part of a restructuring of governmental immunity after *Muskopf*.

When eventually enacted by the Legislature, the bill containing section 3366 was almost identical to what the Law Revision Commission had embraced. (Compare Stats. 1961, ch. 1684, § 2, p. 3306 with Recommendation Relating to Sovereign Immunity*, supra*, 4 Cal. Law Revision Com. Rep., at p. 1506.) Reading the Law Revision Commission's deliberation alongside the legislative history, and what we can glean from the structure of the statute, we discern three purposes that the legislation appears crafted to serve: (1) creating an incentive for

individuals to provide requested law enforcement service; (2) compensating, without concern for fault, someone who is injured while assisting a peace officer with law enforcement duties; and (3) limiting the state's financial exposure.

These goals are best served by a more capacious understanding of "active law enforcement service." The workers' compensation model makes the public agency liable for the costs of the injuries of people assisting police with requested active law enforcement service, whether or not the requesting officer was ultimately at fault. (§ 3600, subd. (a)(3); see also *Shoemaker, supra,* 52 Cal.3d at p. 16.) By expanding availability of workers' compensation, the bill tended to make it easier for individuals to provide assistance, instead of triggering the complexities inherent in making coverage turn on whether individuals correctly discerned whether they were being commanded or requested to provide assistance. This latter scenario is one the Law Revision Commission sought to avoid. The simpler, quicker availability of these benefits can incentivize individuals to oblige a peace officer's request for help, because they will ostensibly be less concerned with the financial consequences of potential injury or death.

Moreover, because peace officers and citizens providing requested assistance may not always know the extent of risk a response implicates, the bill appears to make workers' compensation coverage available whenever a peace officer requests assistance in "active law enforcement service" — as law enforcement duties often entail a risk of injury. (§ 3366, subd. (a) ["engaged in assisting any peace officer in active law enforcement service at the request of such peace officer"].) What

coverage under section 3366 depends on is the nature of the requested assistance.

## B.

A more expansive interpretation of active law enforcement service — covering tasks that objectively qualify as a peace officer's law enforcement duties directly concerned with functions like enforcing laws, investigating and preventing crime, and protecting the public — is also consistent with previous opinions interpreting section 3366, and related provisions of the Labor Code. (See *McCorkle v. City of Los Angeles* (1969) 70 Cal.2d 252, 263, fn. 11; *Page v. City of Montebello* (1980) 112 Cal.App.3d 658.) In *McCorkle*, we concluded that an individual who assists an officer by simply providing "facts within his own knowledge" does not provide active law enforcement service because "[t]he legislative purpose of [section 3366] was to cover a person who assumes the functions and risks of a peace officer." (*McCorkle, supra,* 70 Cal.2d at p. 263, fn. 11.) Whatever the ultimate scope of law enforcement duties is, it does not include the assistance provided in *McCorkle*. In *Page*, the Court of Appeal accepted the Workers' Compensation Appeals Board's determination that an informant who assisted in apprehending individuals dealing narcotics provided active law enforcement service. (*Page, supra,* 112 Cal.App.3d at pp. 661–662.) These cases are consistent with the idea that active law enforcement service encompasses tasks undertaken to protect the public in addition to those directly concerned with enforcing the law or investigating and preventing crime. This construction further vindicates the purpose of the provision's enactment: to mitigate the financial

consequences for individuals assuming the law enforcement duties and risks of police officers.

The phrase "active law enforcement service" appears elsewhere in the Labor Code. (See, e.g., §§ 3212.6, 3212.9, 4850.) When a phrase appears in two statutes dealing with the same subject matter, we usually interpret the phrase to have the same meaning across the provisions. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1161.) Section 4850, subdivision (a) provides for a paid leave of absence in lieu of temporary disability payments for individuals holding positions listed in subdivision (b) if they are injured in the course of their duties. Subdivision (b) includes, among others, city police officers, firefighters, sheriffs, officers or employees of sheriff's offices, and certain personnel in a district attorney's office. But subdivisions (c)(1), (c)(2), and (c)(3) of section 4850 exclude employees of certain offices "whose principal duties are those of a telephone operator, clerk, stenographer, machinist, mechanic, or otherwise, and whose functions do not clearly come within the scope of active law enforcement service."

As with the cases interpreting section 3366, we can discern from cases parsing "active law enforcement service" when it appeared in an earlier version of section 4850 an awareness of the Legislature's purpose to protect employees taking on physical hazards on behalf of the public. (See, e.g., *Kimball v. County of Santa Clara* (1972) 24 Cal.App.3d 780, 785 (*Kimball*); *Biggers v. Workers' Comp. Appeals Bd.* (1999) 69 Cal.App.4th 431, 440–441 (*Biggers*).) *Biggers* focused on this notion, noting that courtroom bailiffs provide active law enforcement service because they expose themselves to hazards as they protect the public — for example, by confiscating guns

and knives and having contact with inmates. (*Biggers, supra,* 69 Cal.App.4th at pp. 440–441.) Interpreting active law enforcement service to reach tasks a police officer undertakes to enforce the law, investigate and prevent criminal activity, or protect the public is consistent with enhanced coverage for police officers: Guarding against loss of livelihood tends to make individuals more likely to undertake these types of law enforcement duties — which provide public benefit but are often dangerous. Whatever its ultimate scope, the investigation and prevention of criminal activity constitute ready examples of how an individual may provide active law enforcement service.

These Labor Code provisions further buttress the case for reading "active law enforcement service" in section 3366 as a broad reference to a peace officer's duties directly concerned with functions such as enforcing laws, investigating and preventing criminal activity, and protecting the public. Section 4850 draws certain distinctions relevant here by categorically establishing positions subject to coverage and excluding from coverage positions whose primary duties are routine and clerical. (See § 4850, subds. (b), (c).) Sections 3212.6 and 3212.9 have similar structures. Some positions merit enhanced coverage under distinctions drawn by the statute, while others are expressly excluded. But section 3366 does not address the principal duties of a full-time employee; it establishes a special circumstance in which an otherwise uncovered individual may receive workers' compensation. Neither the statute nor any relevant prudential principle makes the interpretive question here turn on whether a volunteer performs a "principal duty" of law enforcement officer. Simply asking if a civilian performed one of a peace officer's principal duties could trigger

unnecessarily intricate questions not only about the limits of principal duties, but about whether that question should be resolved by focusing on the actions of individual officers or larger bureaucratic units. A test that pivots on "principal duties" would also virtually guarantee that compensable activities would include those less directly connected to law enforcement, such as filling out a report or engaging in community outreach. Instead of asking if the civilian performed any task that could conceivably be described as a principal duty of a law enforcement officer, we must determine under section 3366 whether the type of task an officer requests constitutes a duty directly concerned with enforcing the laws, investigating or preventing criminal activity, or protecting the public.

Certain Government Code provisions, both current and former, also use the phrase "active law enforcement service" to establish which employees are eligible for various benefits. (See, e.g., Gov. Code, §§ 20436, subd. (a), 31469.3, subd. (b), 31470.3; see *id.*, former §§ 20019, 20020.) As with the Labor Code, the term is undefined. In outlining which government employees are eligible for particular retirement benefits, Government Code former sections 20019 and 20020 provided coverage for local " ' "safety members," ' " including " 'all local policemen.' " (*Crumpler v. Board of Administration* (1973) 32 Cal.App.3d 567, 576 (*Crumpler*), quoting Gov. Code, former § 20019.) The term " ' "[l]ocal policemen" ' " meant " 'any officer or employee of a police department of a contracting agency, except one whose principal duties are those of a telephone operator, clerk, stenographer, machinist, mechanic, or otherwise and whose functions do not clearly fall within the scope of active law enforcement service even though such an employee is subject to

occasional call, or is occasionally called upon, to perform duties within the scope of active law enforcement service.' " (*Crumpler*, at p. 576, italics and fn. omitted, quoting Gov. Code, former § 20020.)

Courts of Appeal construing active law enforcement for purposes of these Government Code provisions also discuss the physical hazards of law enforcement activity. (See, e.g., *Crumpler, supra,* 32 Cal.App.3d at p. 578; *Neeley v. Board of Retirement* (1974) 36 Cal.App.3d 815, 822 (*Neeley*).) But in *Crumpler*, the Court of Appeal concluded that active law enforcement service means "the active enforcement and suppression of crimes and the arrest and detention of criminals," with specific attention to crimes against people or property. (*Crumpler, supra,* 32 Cal.App.3d at p. 578; see *id.*, at pp. 578–579.) Supporting this conclusion, the Court of Appeal discussed a formal opinion from the Attorney General contending that "active law enforcement service" in these Government Code provisions does not extend to everything a police officer does, but rather is limited to physically active work — such as the arrest and detention of criminals — that exposes officers to physical risk. (*Id.* at p. 577, citing 22 Ops.Cal.Atty.Gen. 224, 229.) The Court of Appeal in *Boxx v. Board of Administration* (1980) 114 Cal.App.3d 79 also focused on criminal investigation, finding that a Housing Authority of the City of Los Angeles (HACLA) officer provided active law enforcement service because he was required to make arrests for criminal activity occurring in and around HACLA property. (*Id.* at p. 86.) Although these cases discuss crime suppression and investigation, they ground much of their reasoning in exposure to hazard to provide public protection. Read in this light, action meant to prevent specific

criminal activity — by showing a potential perpetrator that a would-be victim is not isolated, for example — constitutes a common and readily available example, rather than the exclusive category, of the hazards the covered public employees undertake. (See *Glover v. Bd. of Retirement* (1989) 214 Cal.App.3d 1327, 1333 ["The common thread running through cases [that interpret the term 'safety member'] is the concept that the classification of a 'safety member' engaged in active law enforcement is largely controlled by the extent to which the category exposes its holders to potentially hazardous activity"].)

The term "active law enforcement service," then, encompasses the duties of peace officers directly concerned with enforcing the laws, investigating and preventing criminal activity, and protecting the public. These Labor Code and Government Code provisions, and their associated appellate court cases, underscore that "active law enforcement service" is best understood as capacious — but not entirely open ended — to include these core public protection, enforcement, and crime-fighting functions. Drawing precise lines to define these functions is a task we can leave for another day. For today, it's enough to conclude that responding to a 911 call for assistance of an unknown nature — which possibly includes responding to criminal activity — falls well within the lines defining "active law enforcement service."

## C.

Responding to a 911 call for assistance of an unknown nature is what the Gunds did, so they are properly deemed employees under section 3366. In applying our two-step framework here, we first ask whether Corporal Whitman asked the Gunds to assist with a type of task that qualifies as active

law enforcement service. For purposes of our review, there is no dispute that the Gunds acted at Corporal Whitman's request. The dispute centers on whether the requested assistance amounts to active law enforcement service, which we conclude encompasses tasks within a peace officer's duties to investigate and prevent crime, enforce the laws, and protect the public.

At its core, the request from Corporal Whitman was that the Gunds respond to a 911 call for help of an unspecified nature. Responding to a 911 call for unspecified help serves a vital public protection purpose. As the Gunds assert, Corporal Whitman explained that Kristine called 911 seeking help. Because he was far away, Corporal Whitman sought the Gunds' help to check on Kristine at her home. That Corporal Whitman or one of his law enforcement colleagues would ordinarily provide such a response is unremarkable and uncontroversial. Whatever the limits of "active law enforcement service" under section 3366 as we defined the phrase above, the requested service here falls within it.

The specific details of the exchange between Corporal Whitman and Mrs. Gund do not change the essential nature of his request that the Gunds respond to a 911 call for unspecified help. After requesting Mrs. Gund's assistance, Corporal Whitman implored her not to go alone to Kristine's home, which prompted her to ask what Kristine said in the 911 call. Corporal Whitman relayed that Kristine said, "Help me." Mrs. Gund asked, "Are you sure? Is that all she said?" Corporal Whitman confirmed, "[S]he said two words, 'Help me.'" Corporal Whitman made clear he did not know the reason for Kristine's call for help. After learning the Gunds were familiar with Kristine's property because they had assisted the previous

owner with snow and fallen trees, Corporal Whitman noted there was a big storm coming. He said, "[t]hat must be what this is all about. It's probably no big deal." But he followed by asking Mrs. Gund if she knew Kristine's boyfriend and if he ever seemed violent. Mrs. Gund replied that she "didn't know," but offered that "[h]e seemed real mellow." Despite Corporal Whitman's assessment that there was likely a weather emergency and that it was "probably no big deal," his general request was still one for a response to a 911 call for help of an uncertain nature.[5]

The dissent treats Corporal Whitman's assessment that Kristine's 911 call "must be" weather related and "probably no big deal" as an assurance to the Gunds about what awaited them at their neighbor's home. (Dis. opn., *post*, at p. 5.) But Corporal Whitman also conveyed that Kristine had said two words, " 'Help me.' " He used equivocal language to assess the situation, noting that the issue "must be" weather-related and that it was "probably no big deal." After this speculation, he asked whether Kristine's boyfriend seemed violent. Though it may have been eminently sensible for the Gunds to conclude Kristine was likely having a weather-related emergency based on this assessment, that sensibility did not convert the requested assistance in response to a 911 call for unspecified

---

[5] The dissent claims our conclusion does not consider relevant "the words, facts, and context" of a peace officer's request. (Dis. opn., *post*, at p. 17; see also *id*. at pp. 4, 5, 8–9.) We conclude instead that the information discussed in Corporal Whitman's call to Mrs. Gund did not alter the essential nature of the requested task — which remained a response to a 911 call for help of an uncertain nature and, thus, "active law enforcement service."

help into a request concerning a weather-related issue that could conceivably prove beyond the scope of "active law enforcement service."

Under these circumstances, Corporal Whitman's omissions — Kristine's whispering, the CHP dispatcher's belief the call was secret, and the county dispatcher's return calls going straight to voicemail — may have provided additional context for the Gunds to suspect they might encounter a dangerous situation. But these omissions do not change our conclusion that Corporal Whitman's request was that the Gunds respond to a 911 call for unspecified help — a typical law enforcement task often associated with investigation of possible criminal activity, response to such activity, or protection of the public.[6] (See, e.g., *Crumpler, supra,* 32 Cal.App.3d at p. 577, citing 22 Ops.Cal.Atty.Gen. at p. 229.)

---

[6] The dissent takes our conclusion to mean that misrepresentations — even lies — do not matter in situations where police request assistance from volunteers. (Dis. opn., *post*, at pp. 3, 5, 8–10.) But our conclusion isn't that misrepresentations are irrelevant — it's that even viewing the facts in the light most favorable to the Gunds, Corporal Whitman's request remained one for active law enforcement service. Nor do we foreclose the possibility that misrepresentations may affect the availability of other remedies such as tort actions. (See *post*, at pp. 32–33, 33, fn. 7.) The dissent's conclusion seems to be instead that the presence of an alleged misrepresentation can by itself remove an activity from even possibly being within the scope of "active law enforcement service." (Dis. opn., *post,* at pp. 3, 4–6, 9, 16–17.) But it's worth bearing in mind that even as the Gunds here seek to limit the purview of workers' compensation so they can pursue what they consider to be a viable tort claim, many injured volunteers lack

We next ask whether the Gunds were injured while engaged in assisting with that law enforcement service — mirroring the typical workers' compensation requirement that an injury arise out of and in the course of employment. (§ 3600, subd. (a)(3).) There is no question the Gunds "engaged in assisting" Corporal Whitman. And they sustained their injuries while responding, as requested, to a 911 call for help, an active law enforcement task. After entering Kristine's home, the Gunds faced her murderer, who cut their throats and punched and tased Mr. Gund.

Under these circumstances, Corporal Whitman requested that the Gunds assist in active law enforcement service, and the Gunds were injured in the course of providing that service. Section 3366 applies, and workers' compensation benefits are the Gunds' exclusive state law remedy. (§ 3602, subd. (a).)

## III.

We have established that the state has liability for the Gunds' injuries under workers' compensation because they were injured in the course of assisting with active law enforcement service at the request of a peace officer. The Gunds nonetheless argue that any misrepresentation by the requesting officer about the nature of the risk involved trumps the application of this statutory test.

---

a viable tort claim and must instead make do with workers' compensation or nothing. The last thing we should imply is that police are free to conveniently gerrymander the scope of section 3366 simply by baking into their requests for volunteer assistance misrepresentations creating enough ambiguity for a reasonable person to conclude the task does not involve "active law enforcement service."

Corporal Whitman's misrepresentations matter, the Gunds allege, because whether they engaged in active law enforcement depends in part on what they subjectively believed to be true about Kristine's 911 call and their provided service. To support this proposition, the Gunds rely on the plurality opinion in *People v. Ray* (1999) 21 Cal.4th 464 (lead opn. of Brown, J.) (*Ray*). This reliance is misplaced. *Ray* is a Fourth Amendment case concerning the community caretaking function exception to the warrant requirement for a search. (See *id.* at pp. 467–468.) In the Fourth Amendment context, a plurality opinion concluded that the community caretaking exception to the warrant requirement does not apply where a stated reliance on property protection is pretext for a crime-solving rationale. (*Id.* at p. 477.) There, the subjective and reasonable belief of the officer directs whether the exception applies. (*Id.* at pp. 476–477.)

But nowhere on the textured surface of section 3366 is there a place onto which we can graft a subjective understanding component. First, community caretaking does not incorporate subjectivity in a way that supports a place for it in this scheme. We recently disapproved the lead opinion in *Ray*, rejecting its rationale for allowing warrantless entries under the community caretaking doctrine. (*People v. Ovieda* (2019) 7 Cal.5th 1034, 1038.) Second, *Ray* does not interpret section 3366 or any other California statute with the phrase "active law enforcement service," and, unlike *Ray*, the present case does not interpret federal constitutional law. Third, California cases that have construed the phrase "active law enforcement service" in other statutes considered what an individual actually did, suggesting an objective inquiry. (See

*Neeley, supra*, 36 Cal.App.3d at p. 818, fn. 2; *Biggers, supra,* 69 Cal.App.4th at p. 441.) Determining whether an individual provides active law enforcement service remains an objective inquiry. As we concluded above, the alleged omissions may have provided more information as to the danger the Gunds faced, but they do not change our conclusion that Corporal Whitman's request that the Gunds respond to a 911 call for help is a task within the law enforcement duties of a peace officer, and therefore a request for active law enforcement service.

The Gunds seem to imply that misrepresentations matter because they bear on whether an individual subjectively understood the hazards involved in assisting an officer. This approach risks consequences that are difficult to justify. Under their approach, the subjective understanding of an individual request would be central to our analysis. That would potentially leave individuals providing the same type of assistance with different coverage determinations depending on the specifics of a request or the individual's ability to assess the risks inherent in the type of requested service.

The Gunds additionally contend that section 3366 does not apply when a plaintiff alleges that a request for assistance contains misrepresentations, because the misrepresentations render any assistance involuntary. They rely on *Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222 for this proposition. But their reliance on *Moyer* is misplaced. In *Moyer,* we discussed an employee's choice to accept a rehabilitation program for which section 139.5 required such acceptance to be " 'voluntary and not be compulsory.' " (*Id.* at p. 229.) *Moyer* does not bear on whether an individual voluntarily provides active law enforcement service.

Furthermore, even when an employer intentionally conceals and misrepresents hazards in order to induce an individual to accept employment, workers' compensation is the individual's exclusive remedy. (See *Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 157–158 (*Cole*); *Wright v. FMC Corp.* (1978) 81 Cal.App.3d 777, 779; *Buttner v. American Bell Tel. Co.* (1940) 41 Cal.App.2d 581, 584.) In *Cole*, we explained that an employer's intentional and deceitful conduct should not take an action outside of the workers' compensation system because it would convert the focus of litigation into an issue of the employer's state of mind and away from whether the injury arose out of and in the course of employment. (*Cole, supra,* 43 Cal.3d at p. 158.) We reasoned that allowing actions for damages based on the employer's state of mind would significantly disturb the balance of the workers' compensation system: swift and certain payment for the injured employee in exchange for the employer's immunity from liability at law. (*Ibid.*) Put differently, allowing allegations of misrepresentation to take claims like this outside the workers' compensation system would disturb the carefully balanced scheme the Legislature designed.

A plaintiff may, however, allege a tort claim under circumstances not argued here. A plaintiff may pursue tort claims for intentional misconduct that has only a questionable relationship to the employment, an injury that did not occur while the employee was performing a service incidental to and a risk of the employment, or where the employer stepped out of its proper role. (*Fermino v. Fedco, Inc.* (1994) 7 Cal.4th 702, 713 (*Fermino*) [citing *Cole, supra,* 43 Cal.3d at p. 161].) These types of injuries are beyond the compensation bargain. (*Fermino,*

*supra,* 7 Cal.4th at p. 714.) But these are not the types of injuries the Gunds assert. Their assertion that Corporal Whitman's misrepresentations caused their injuries turns on his state of mind and does not present a case in which he engaged in some conduct beyond the employment-like relationship created by section 3366. Also lying well beyond the compensation bargain, and an exception to the exclusivity provision, are injuries where the employer's motive violates a fundamental policy of the state. (*Charles J. Vacanti, M.D. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 812.) The Gunds assert that Corporal Whitman's alleged misrepresentations inducing their assistance constitute such a violation of fundamental policy. We need not address that contention here, though, because the Gunds did not raise this argument in the trial court, the Court of Appeal, or their Opening Brief. The first time the Gunds raise this argument is in their Reply Brief. This argument is, therefore, forfeited. Our holding today does not foreclose a civil action where this argument is properly raised.[7]

Finally, although workers' compensation does not provide the full menu of remedies available in tort, it is far from meaningless. Injured civilians, like the Gunds, can receive compensation for their injuries without having to fight over what an officer communicated or whether it amounted to negligence. (§ 3600, subd. (a)(3).) This is a simpler path to compensation. The workers' compensation scheme also accounts for injuries resulting from employer misconduct.

---

[7]     Our holding also does not bear on the viability of claims under Title 42 United States Code section 1983. (See *Martinez v. California* (1980) 444 U.S. 277, 284, fn. 8 [" 'Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 . . . cannot be immunized by state law' "].)

Section 4600, subdivision (a) provides for treatment "that is reasonably required to cure or relieve the injured worker from the effects of the worker's injury." And section 4553 provides that the amount of coverage recoverable "shall be increased one-half . . . where the employee is injured by reason of the serious and willful misconduct" of certain agents of the employer. The purpose of this provision is to provide "more nearly full compensation to an injured employee" who is injured as a result of such willful misconduct. (*State Dept. of Correction v. Workmen's Comp. App. Bd.* (1971) 5 Cal.3d 885, 889.) This enhanced workers' compensation benefit is available against public employers. (*Id.* at p. 891.) This means that although the workers' compensation scheme allows more limited recovery than what is available through tort litigation (see, e.g., *Shoemaker, supra,* 52 Cal.3d at p. 16), plaintiffs like the Gunds may be able to recover more complete compensatory damages if they are able to establish willful misconduct.

Simply alleging a request for assistance contained a misrepresentation, without more, does not preclude application of section 3366 and the exclusivity provision. Neither do misrepresentations alter our construction of "active law enforcement service," which considers the type of task rather than an individual's subjective understanding of risk.

## IV.

Section 3366 protects the public by spreading the costs of injuries risked by the people who volunteer to assist police by providing "active law enforcement service." When members of the public assist the police by performing a task within the purview of officers' conventional "law enforcement" duties — those directly concerned with enforcing the laws, investigating

or preventing crime, or providing public protection — members of the public assuming the risk of helping are protected by workers' compensation just as police officers are. Both the relevant words and underlying logic of the statute compel us to understand "active law enforcement service" requested by a peace officer in capacious terms. Encompassed by these words are activities objectively associated with functions such as public protection or criminal investigation and enforcement, without regard to whether the requesting officer sufficiently conveys the full extent of the risks or whether a volunteer subjectively understands the risks police were asking her to assume. This is the reading most consistent with section 3366's purpose as reflected in its language, structural logic, and legislative history. Officers rightly concerned about public protection would do well to help volunteers understand the risks they may be assuming to assist in "active law enforcement service," but nothing in the statute renders the term malleable enough to make access to workers' compensation turn on the contingency of whether volunteers understood they were assuming substantial risk to assist in policing. Whatever the ultimate limits of "active law enforcement service" in this context, we cannot find a sensible rationale to exclude the Gunds' police-requested sortie to check on a neighbor who called 911 for unspecified help.

No one disputes the Gunds were selfless neighbors and, when carrying out Corporal Whitman's request, model citizens. With little information, they agreed to help their neighbor in a time of need. And they suffered mightily for providing that help. But we cannot fashion a rule that somehow shrinks the scope of workers' compensation for the Gunds — effectively leaving them

with no remedy at all for their injuries if they lack a viable tort claim — while keeping it robustly consistent with its legislatively determined scope for countless other volunteers. When injuries to a volunteer trigger provisions making society bear the cost of those harms through workers' compensation, this means greater protection for volunteers assisting law enforcement, and greater clarity for society about the costs it must bear through its institutions when harms tragically occur. Because the help the Gunds provided was active law enforcement service, and the workers' compensation bargain offers protection with one hand even as it removes access to civil recourse with the other, the only remedy available to the Gunds is through workers' compensation. This outcome makes it easier for police to benefit from the public's help, and ultimately, for the public to benefit from the police's help.

So we affirm the judgment of the Court of Appeal.


**CUÉLLAR, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**

GUND v. COUNTY OF TRINITY

S249792

Dissenting Opinion by Justice Groban

On a small ranch in a remote area, near the end of winter, Norma Gund received an unexpected call from Trinity County Sheriff's Corporal Ronald Whitman. Corporal Whitman told Ms. Gund that her neighbor had called 911 asking for unspecified help. After learning that Ms. Gund and her husband, James Gund, had been to the neighbor's house "many times" before to help the prior owner with weather-related events such as "snow and fallen trees," Corporal Whitman remarked "There's a big storm coming. That must be what this is all about. It's probably no big deal." The Gunds are a middle-aged couple who have no law enforcement training or experience. But, having heard Corporal Whitman's assessment that the 911 call "must be" weather related and was "probably no big deal," the Gunds readily obliged with his request to go check on their neighbor.

While driving to their neighbor's house, the Gunds speculated that their neighbor — "a young, naïve city girl" who had just recently moved to the area — might be having trouble operating her wood-burning stove or, perhaps, a tree had fallen on her house. Unbeknownst to the Gunds, Corporal Whitman had omitted crucial facts including that their neighbor had whispered on the 911 call; had desperately repeated "help" over and over again before abruptly ending the call; and the Highway Patrol dispatcher who had received the call was leery of calling the neighbor back because it sounded like "she's trying to hide the fact that she's calling [911] from somebody." Corporal Whitman also

1

failed to mention that a different dispatcher had nevertheless twice attempted to call the neighbor back, but those calls went unanswered.

Oblivious to any potential risk and thinking she was about to assist a neighbor with a nondangerous task, Ms. Gund entered the neighbor's house alone and unarmed while Mr. Gund waited in the car. Inside the house, a murderer had just killed the Gunds' neighbor and her boyfriend. The still-present murderer immediately attacked Ms. Gund with a stun gun and a knife, brutally slashing her throat and face. Upon hearing the commotion, Mr. Gund got out of the car and approached the house. He saw the murderer cutting his wife and, when he ran inside to try to protect her, the murderer began to attack Mr. Gund. Ms. Gund fled the scene and frantically drove to a nearby store to seek help. Meanwhile, Mr. Gund fought for his life as the murderer repeatedly "Tased" him, punched him, and cut his throat. Somehow, Mr. Gund managed to wrestle the knife out of the murderer's hands and escaped by running through the woods back to his home. The Gunds suffered near-fatal injuries but miraculously survived.

Based on the belief that the Gunds were providing "active law enforcement service" (Lab. Code, § 3366, subd. (a)) when they became the unwitting victims of this horrific crime, the majority holds that the Gunds are limited to workers' compensation and cannot sue in tort to recover damages for their injuries. The majority's view is premised on an assumption I cannot accept: An unarmed, untrained middle-aged couple, by stumbling upon an active murder scene, were in fact working as law enforcement officers. In reality, neither the Gunds nor Corporal Whitman reasonably believed that, by asking the Gunds to check on the

2

neighbor to help with a weather-related event, Corporal Whitman was actually asking the Gunds to perform a law enforcement officer's job of investigating a crime, arresting a criminal, or performing some other particularly hazardous task for the protection of the public. The Gunds' understanding was objectively reasonable in light of Corporal Whitman's opinion that the call "must be" all about a big storm coming and was "probably no big deal." But in the majority's view, Corporal Whitman's assessment of the nature of the 911 call does not matter. Corporal Whitman's failure to inform the Gunds that their neighbor had whispered on the 911 call does not matter. Corporal Whitman's failure to inform the Gunds that the neighbor had desperately repeated "help" over and over again before abruptly ending the call does not matter. Corporal Whitman's failure to inform the Gunds that the county dispatcher's return calls went unanswered does not matter. The Gunds' prior experiences in helping with weather-related events at the neighbor's house does not matter. Even lies do not matter.

I disagree.

## I. DISCUSSION

I begin by noting the points on which I agree with the majority, as our agreement is considerable. I agree with the majority's proposed two-part test to determine whether Labor Code section 3366, subdivision (a) (section 3366) applies. (Maj. opn., *ante*, at p. 8.) I also agree that the peace officer's request informs the determination of whether section 3366 applies. (Maj. opn., *ante*, at pp. 8, 23.) I agree that the civilian's subjective beliefs regarding the nature of the requested assistance or its attendant risks are irrelevant. (*Id.* at pp. 30–31.) I further agree that the question of whether a peace officer requested the civilian to assist with a task that qualifies as active law enforcement service is an

3

objective inquiry. (*Id.* at pp. 20, 30–31.)[1] Finally, I agree that a request to investigate possible criminal activity is a request for active law enforcement service. (Maj. opn., *ante*, at p. 25.)

My disagreement lies with the majority's conclusion that the "specific details" of the exchange between Corporal Whitman and Ms. Gund "do not change the essential nature of his request." (Maj. opn., *ante*, at p. 26.) In my view, the details change everything. The majority frames its test to determine whether something qualifies as active law enforcement service at an exceedingly high level of generality, first by describing the phrase as "capacious" (*id.* at pp. 11, 14, 19, 25, 35) and then by focusing on only the "essential nature of the requested task" (*id.* at p. 27, fn. 5). But if we agree that " 'the words, facts, and context' of a peace officer's request" matter (*ibid.*), then the "specific details" (*id.* at p. 26) of the exchange between Ms. Gund and Corporal Whitman should matter too. I do not understand why the majority limits its inquiry by excluding any analysis of what the parties objectively understood about the nature of the requested task. While I agree with the majority that the inquiry is objective, I would formulate the objective test differently. We should examine everything that was said, and everything that was not said, when Corporal Whitman made his fateful request of the Gunds, and ask whether an

---

[1] The majority describes the Gunds' position as being premised on "what they subjectively believed to be true about [their neighbor's] 911 call" (maj. opn., *ante*, at p. 30) and whether they "subjectively understood the hazards involved in assisting an officer" (*id.* at p. 31). I do not interpret the Gunds' argument in the same way. The Gunds seem to agree the inquiry is objective, asserting that the question is "whether a reasonable person . . . would reasonably perceive a need for assistance related to the enforcement of law or suppression of crime" based on Corporal Whitman's request.

objectively reasonable person would understand his request to be one for assistance with a task that qualifies as active law enforcement service.

While I believe many requests to respond to a 911 call of an uncertain nature will objectively be understood as a request for assistance with active law enforcement service, Corporal Whitman's request was different. Corporal Whitman expressly characterized the nature of the call, assuring Ms. Gund that the request "must be" about "a big storm coming" and was "probably no big deal." He also failed to relay to Ms. Gund critical details of the 911 call that would make her aware of the true nature of the request and the potential danger. The majority believes that this context does not matter. I believe it is crucial. Indeed, the Legislature recognized in enacting section 3366 that peace officers are authority figures that most people respect, trust, and obey. (Second Supp. to Mem. No. 23 (1962), Subject: Study No. 52(L) – Sovereign Immunity (Workmen's Compensation for Persons Assisting Peace Officers) (May 18, 1962) Cal. Law Revision Com. (1962) p. 1 (hereafter Second Supplement To Memorandum 23) [recognizing that many people would feel it was their "civic duty" to assist a police officer whenever requested to do so].) Thus, at the core of section 3366 is an acknowledgment that civilians give considerable deference to peace officers. Although the majority observes this principle (maj. opn., *ante*, at p. 17), it ultimately devalues it by discounting the import of Corporal Whitman's representation to Ms. Gund that the call "must be" related to the weather. But if we agree that the inquiry is objective rather than subjective, and if we agree that any civilian receiving such a request would likely defer to the authority of the peace officer, then Corporal Whitman's judgment as to what the 911 call "must be"

5

about is key. Corporal Whitman — the person with law enforcement experience and the person who had spoken directly with a dispatcher regarding the 911 call — told Ms. Gund that the call "must be" related to the weather and was "probably no big deal." The Gunds had every right to believe him.[2]

I also cannot accept the majority's conclusion that Corporal Whitman's alleged omissions would simply have provided "more information" to the Gunds. (Maj. opn., *ante*, at p. 31.) This, in my view, is a significant understatement. The majority and I agree that the inquiry here is an objective one, but I believe that this inquiry should take into account the relevant facts and circumstances of the particular case. We must therefore ask ourselves if an objectively reasonable person would consider the following facts to be material in determining the type of assistance requested and whether to agree to render the requested assistance: (1) the 911 caller had desperately repeated "help" over and over again before abruptly ending the call; (2) the Highway Patrol dispatcher who had received the call was leery of calling the neighbor back because it sounded like "she's trying to hide the fact that she's calling [911] from somebody"; and (3) the Trinity County dispatcher had nevertheless twice attempted to call the neighbor back, but those calls went unanswered. We should further ask ourselves whether a reasonable person would have found these facts to be highly relevant before deciding whether to enter the

---

[2]     The majority emphasizes that Corporal Whitman advised Ms. Gund not to go to her neighbor's house alone (maj. opn., *ante*, at p. 26), but this advice came before he rendered his opinion that the call was "probably no big deal." And, although Corporal Whitman also asked Ms. Gund whether the caller's boyfriend had ever seemed violent, Ms. Gund replied "he seems real mellow."

home, alone and unarmed. Possessed of these details, would Mr. Gund really have chosen to wait in the car while sending his wife into the neighbor's house alone?

To accept the majority's holding that the Gunds were asked to and did in fact engage in an inherently dangerous law enforcement task, one must accept its implicit suggestion that the Gunds acted incredibly recklessly by having Ms. Gund walk in to the home unarmed, with little or no preparation, while her husband waited in the car. One must also accept the majority's implicit, if not explicit, assumption that Corporal Whitman asked two untrained, unarmed middle-aged civilians to risk injury or death to "investigate and prevent crime, enforce the laws, and protect the public" (maj. opn., *ante*, at p. 26) without the aid of trained law enforcement officers. Even the Trinity County Sheriff's Department denied that it would ever do such a thing, stating in a press release issued shortly after the incident that it would never "send a citizen to perform a Deputy's job." (Sabalow, *This couple was attacked by knife-wielding killer. Did their sheriff put them in harm's way?*, Sacramento Bee (Aug. 29, 2018) <https://www.sacbee.com/latest-news/article216246885.html> [as of August 27, 2020] (hereafter Sabalow).) [3] I believe that a reasonable person, upon hearing Corporal Whitman's description of the 911 call — which characterized the call as "no big deal" and weather related and omitted crucial details that would have alerted the Gunds to the potential danger — would not have understood Corporal Whitman's request to be seeking help with

---

[3]    All Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.

"the investigation and prevention of criminal activity." (Maj. opn., *ante*, at p. 22.)

The majority at one point suggests that misrepresentations may matter if they alter the "essential nature of the requested task" (maj. opn., *ante*, at p. 27, fn. 5; see *id*. at p. 28, fn. 6), but then it later implies that misrepresentations are irrelevant since workers' compensation is the exclusive remedy even where employees allege that their employers intentionally misrepresented the hazards of employment in order to induce them to accept employment (*id*. at pp. 31–32).[4] Though the majority does not explain how to distinguish between misrepresentations that go to the "essential nature of the requested task" (*id*. at p. 27, fn. 5) from other kinds of misrepresentations, I understand that the majority may be rightly concerned about a holding that concludes that misrepresentations are never relevant to the analysis. The majority may also be wary of creating a bright-line rule under which all responses to 911 calls would constitute active law enforcement service, as some clearly do not. Many 911 calls verge on the absurd, with callers complaining about the size of clams served at a restaurant, cats stuck under the hood of a car, or a lack of internet service. (Jarosz, *Abuse of 911: Alarming number of callers use emergency service as customer service line*, KTVU Fox 2 (Sept. 25, 2018) <https://www.ktvu.com/news/abuse-of-911-

---

[4]     The majority is correct that misrepresentations made by an employer to an employee about the dangers of a work environment usually do not preclude application of the workers' compensation exclusivity rule (maj. opn., *ante*, at pp. 31–32), but we are not asked here to interpret an ordinary workers' compensation statute applicable to the employment context. In this nonemployment context, the actual request is central to determining whether the civilian was injured in a "qualifying 'employment' " in the first place. (*Id*. at p. 8.)

alarming-number-of-callers-use-emergency-service-as-customer-service-line> [as of August 27, 2020].)  The majority considers the context and content of the request, but only to determine whether the peace officer conveyed a request to respond to a 911 call seeking unspecified help.  It therefore appears to conclude that all responses to 911 calls of an uncertain nature constitute active law enforcement as a matter of law, irrespective of whether the parties to the request themselves understood that the response would require members of the public to assume the functions and risks of a peace officer.  But the majority cannot have it both ways:  If the context and content of what was known and conveyed as part of the peace officer's request matters in some instances, then it must matter in all instances.  I certainly think it matters here.

I do not mean to suggest that Corporal Whitman intentionally misrepresented the true nature of the situation or wished the Gunds any harm.  Corporal Whitman was hours away from the 911 caller's home and may have simply been trying to find a solution to a very difficult dilemma.  Nevertheless, as a general matter, if a peace officer's misrepresentations and omissions regarding the nature of the 911 call or the requested assistance may be ignored (see maj. opn., *ante*, at pp. 31–32), then a peace officer could intentionally lie about the potential danger involved and assure the civilian that no harm will come to him or her, and the civilian still would be unable to pursue a remedy in tort.  Under the majority's holding, if the peace officer requests assistance with a task that entails a possibility of requiring a law enforcement response, then the civilian is bound by section 3366 regardless of what the civilian reasonably understood about the nature of the requested task in light of the peace officer's misrepresentations.  This cannot be right.

To illustrate this quandary further, consider the disparate results that would likely result under the majority's holding in the following two scenarios: Suppose a peace officer requests a civilian to help a neighbor who was having trouble starting her car, even though the officer knew the caller had reported an armed intruder. The majority would likely hold that because the peace officer's misrepresentation "alter[ed] the essential nature of the requested task" (maj. opn., *ante*, at p. 27, fn. 5), section 3366 does not apply. But suppose the officer, rather than relaying the report of an armed intruder, had simply misrepresented to the civilian that the 911 caller had asked for "unspecified help." The officer then goes on to tell the following additional lies: "This person always calls about car problems. It must relate to car problems. There is nothing to worry about, you will be completely safe." The majority would presumably conclude that because the peace officer requested assistance with "a 911 call for unspecified help — a typical law enforcement task" (*id.* at p. 28), section 3366 applies. The only true difference between these two hypothetical scenarios is, in the first scenario, the peace officer lied by stating that the caller specifically requested help with her car, whereas in the second scenario, the peace officer lied by stating the caller asked for unspecified help and also by misrepresenting that the call "must relate to car problems." Under the majority's formulation, the civilian in the first scenario has a tort remedy, but the civilian in the second scenario does not. I see no reason for this distinction.

I also disagree with the majority's conclusion that the Gunds were "enforcing the laws, investigating or preventing crime, or providing public protection." (Maj. opn., *ante*, at p. 34.) Neither Ms. Gund (who thought that her neighbor might be having "trouble with her wood-burning stove"), Mr. Gund (who let his

wife walk into the neighbor's house while he waited in the car), Corporal Whitman (who said the call "must be all about" "a big storm coming") nor the Trinity County Sheriff's Department (which said it would never "send citizen to perform a Deputy's job" (Sabalow, *supra*, at <https://www.sacbee.com/latest-news/article216246885.html>)) thought the Gunds were "assuming the law enforcement duties and risks of police officers." (Maj. opn., *ante*, at p. 20.) When peace officers perform active law enforcement service, they do so knowingly and with some level of preparation. Similarly, in those few cases in which we have analyzed whether certain civilians were entitled to workers' compensation when they were commanded to assist in a law enforcement task, those civilians knew they were assuming the functions and risks of a peace officer and were at least somewhat prepared to do so. (See, e.g., *Monterey County v. Rader* (1926) 199 Cal. 221, 223 [civilian was given a firearm and was led by trained officers in attempting to capture criminals].) Here, in contrast, Ms. Gund entered the house alone and unarmed, neither of the Gunds demonstrating any concern for her safety. The Gunds clearly did not expect to, and were not prepared to, investigate a possible crime, arrest a criminal, or prevent a breach of the peace, nor should they have been given their reasonable understanding, based on Corporal Whitman's request, that checking on their neighbor would *not* require them to perform a law enforcement task.

And the Gunds were right not to assume that their response to the 911 call would require them to "enforce[] the laws, investigat[e] or prevent[] crime, or provid[e] public protection" (maj. opn., *ante*, at p. 34) since most 911 calls do not involve criminal activity. (Neusteter et al., *The 911 Call Processing System: A Review of the Literature as it Relates to Policing*, Vera

Institute of Justice (July 2019) p. 34 [most 911 calls "are unrelated to crimes in progress"].) The Sacramento Police Department reports that its officers have spent only 4 percent of their time this year responding to calls reporting violent crimes and only 19 percent of their time responding to calls reporting nonviolent crimes. (Asher & Horwitz, *How Do the Police Actually Spend Their Time?*, N.Y. Times (June 19, 2020) <https://www.nytimes.com/2020/06/19/upshot/unrest-police-time-violent-crime.html> [as of August 27, 2020].) Similarly, of the nearly 18 million 911 calls logged by the Los Angeles Police Department in 2010, less than 8 percent reported violent crimes. (Rubin & Poston, *LAPD responds to a million 911 calls a year, but relatively few for violent crimes*, L.A. Times (July 5, 2020) <https://www.latimes.com/california/story/2020-07-05/lapd-911-calls-reimagining-police> [as of August 27, 2020].) The Gunds were not entering their neighbor's house to perform an inherently dangerous law enforcement task. Instead, the Gunds reasonably understood that they were being asked to provide neighborly assistance with a weather-related problem and tragically stumbled into a murder scene.

The majority purposefully avoids "[d]rawing precise lines to define" what tasks would fall within "active law enforcement service" (maj. opn., *ante*, at p. 25) and instead repeatedly describes the phrase as being "capacious" (*id.* at pp. 11, 14, 19, 25, 35). Nonetheless, the majority nowhere suggests that assisting a neighbor with snow, a fallen tree, a wood-burning stove, or some other weather-related problem objectively qualifies as active law enforcement service. Nor could it reasonably do so given that, as the majority acknowledges, the phrase "active law enforcement service" as used elsewhere in the Labor and Government Code has

long been defined as encompassing "a peace officer's duties directly concerned with functions such as enforcing laws, investigating and preventing criminal activity, and protecting the public." (Maj. opn., *ante*, at p. 22; see also *Kimball v. County of Santa Clara* (1972) 24 Cal.App.3d 780, 785 [active law enforcement service encompasses particularly hazardous job functions undertaken for the protection of the public].) The court in *Crumpler v. Board of Administration* (1973) 32 Cal.App.3d 567, for example, held that animal control officers who are hired by the police department, wear uniforms, and carry guns do not principally perform "active law enforcement service" because they do not deal with hazardous crimes "against persons and property." (*Crumpler*, at p. 579.) The court found persuasive an Attorney General opinion — one which was issued 10 years prior to section 3366's enactment — that defines "active law enforcement service" as including "duties which expose officers to physical risk" such as " 'the active investigation and suppression of crime; the arrest and detention of criminals and the administrative control of such duties.' " (*Crumpler*, at p. 577, quoting 22 Ops.Cal.Atty.Gen. 227, 229 (1953).) This definition is in accord with the Legislature's intent in enacting section 3366 that only those civilians who "assume the risk of death or serious injury to provide . . . protection to the public" at the request of a peace officer would be covered by workers' compensation. (Recommendation Relating to Sovereign Immunity, Number 6 — Workmens' Compensation Benefits for Persons Assisting Law Enforcement or Fire Control Officers (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) p. 1505.) Simply put, a civilian does not risk death or serious injury for the protection of the public by helping a neighbor with a weather-related event.

I am additionally unpersuaded by the majority's policy rationales for its holding. The majority reasons that "quicker availability of [workers' compensation] benefits can incentivize individuals to oblige a peace officer's request for help, because they will ostensibly be less concerned with the financial consequences of potential injury or death." (Maj. opn., *ante*, at p. 19.) Though a person might conceivably be motivated to assist a peace officer based on the availability of workers' compensation, I am skeptical that the average civilian would make a quick assessment of possible tort or statutory recovery outcomes before complying with a peace officer's request. As noted above, the Legislature recognized that most people will feel compelled to assist peace officers as part of their "civic duty" and regardless of whether compensation for their injuries might be available. (Second Supp. To Mem. 23, *supra*, at p. 1.) I certainly cannot imagine that the Gunds were thinking about the ready availability of workers' compensation when they agreed to check on their neighbor at Corporal Whitman's request. Moreover, the rule embraced by the majority — one that allows peace officers to omit crucial information or even to lie in order to convince civilians to render assistance without risking tort liability — will only disincentivize civilians from agreeing to help. (See *Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 298 [" 'The abuse of a patrolman's office can have great potentiality for social harm' "]; *Schuster v. City of New York* (1958) 5 N.Y.2d 75, 80–81 [154 N.E.2d 534] [the government "owes a special duty to use reasonable care for the protection of persons who have collaborated with it in the arrest or prosecution of criminals" because it would otherwise "become difficult to convince the civilian to aid and co-operate with the law enforcement officers"].)

14

More fundamentally, I am wary of the majority's tendency to view the availability of workers' compensation as beneficial to civilians, no matter the circumstances. (See maj. opn., *ante*, at pp. 15–19.) The so-called workers' compensation bargain is just that — a bargain. "It should not be viewed as a victory of employees over employers." (Friedman & Ladinsky, *Social Change and the Law of Industrial Accidents* (1967) 67 Colum. L.Rev. 50, 71.) Workers' compensation may be "a simpler path to compensation" for the Gunds (maj. opn., *ante*, at p. 33), but it is not their preferred path, which is why they so vigorously oppose its application here. The majority's ruling precludes the Gunds from seeking "pain and suffering" damages (*San Bernardino County v. State Indus. Acc. Commission* (1933) 217 Cal. 618, 625), which includes damages to compensate them for their physical pain as well as any "fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal" they have suffered since becoming the victims of a particularly brutal attack (*Capelouto v. Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892–893). I do not think anyone doubts that the Gunds have suffered considerable pain and suffering as a result of this horrible crime, but the majority's holding will not allow them to be compensated for it. The Gunds will also be unable to seek punitive damages to compensate them for defendants' alleged wrongdoing. (*Johns-Manville Products Corp. v. Superior Court* (1980) 27 Cal.3d 465, 478.)

The majority worries about creating a rule that looks closely at the specific details and context of the peace officer's request, believing this would open the door for defendants to refuse to provide workers' compensation by claiming that the request did not specifically seek assistance with a law enforcement task. (Maj.

opn., *ante*, at p. 28, fn. 6.) While this is a legitimate concern, I believe it is overstated. The facts of this case are incredibly unique and are unlikely to recur. Many cases in which a peace officer seeks a civilian's assistance in responding to a 911 call of an uncertain nature will likely fall within the scope of section 3366. If, for example, Corporal Whitman shared the key details of the 911 call and did not further opine that the call "must be" about the weather and was "probably no big deal," an objectively reasonable person might well conclude that responding to the call entailed the possibility of performing a law enforcement task. We can recognize that the singular facts presented here entitle the Gunds to seek tort relief without precluding courts from finding, in another case, that a different peace officer's request for a civilian to respond to a different 911 call is covered by section 3366. We can also do so without more broadly undermining our workers' compensation system or the Legislature's intent to provide workers' compensation to civilians who assume the functions and risks of a peace officer.

We need not decide how every factual scenario, however unlikely or bizarre, might be decided under this highly esoteric statute. In this case, Corporal Whitman affirmatively described the call as weather related and assured Ms. Gund that the call was "probably no big deal" while also failing to disclose the details of the call that would have revealed the potential danger and need for law enforcement service. The Gunds had every reason to believe Corporal Whitman and almost lost their lives in doing so. They should not lose their tort claims as well.

## II. CONCLUSION

In sum, I agree with the majority that section 3366 applies when a civilian agrees to perform active law enforcement service at

a peace officer's request. But I disagree that Corporal Whitman asked the Gunds to perform an active law enforcement task. Instead, it was objectively reasonable for the Gunds to believe that Corporal Whitman asked them to render neighborly assistance with a relatively risk-free weather-related problem. It was objectively reasonable because Corporal Whitman told the Gunds that the 911 call "must be" weather related and was "probably no big deal." He also failed to disclose important details from the 911 call that would have made them aware of the potential danger they faced and that they were being asked to assume the particularly hazardous functions and risks of a law enforcement officer. More broadly, I believe that the words, facts, and context of the peace officer's request matters. The majority does not see their significance here, but I do. I would therefore hold that the Gunds are not subject to section 3366 and would reverse the judgment of the Court of Appeal. Because the majority holds otherwise, I respectfully dissent.

**GROBAN, J.**

**I Concur:**
**CHIN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Gund v. County of Trinity

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XX 24 Cal.App.5th 185
**Rehearing Granted**

_____

**Opinion No.** S249792
**Date Filed:**  August 27, 2020

_____

**Court:**  Superior
**County:**  Trinity
**Judge:**  Richard Scheuler

_____

**Counsel:**

Zwerdling, Bragg & Mainzer, Bragg, Mainzer & Firpo and Benjamin H. Mainzer for Plaintiffs and Appellants.

Porter Scott and John R. Whitefleet for Defendants and Respondents.

Arthur J. Wylene for Rural County Representatives of California and League of California Cities as Amici Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Benjamin H. Mainzer
Bragg, Mainzer & Firpo, LLP
804 Third Street
Eureka, CA 95501
(707) 445-7917

John R. Whitefleet
PORTER SCOTT
350 University Avenue, Suite 200
Sacramento, CA 95825
(916) 929-1481